UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/24/14

------------------------------------------------------- X

JOSE L. MORALES,

       **Plaintiff,**

  - against -

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

       **Defendant.**

------------------------------------------------------- X

**OPINION AND ORDER**

**13-cv-4302(SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Jose Morales, proceeding pro se, brings this action, pursuant to the

Social Security Act (the "Act"),[1] seeking judicial review of a final decision by the

Commissioner of Social Security (the "Commissioner") denying his claim for

Social Security and Supplemental Security Income ("SSI") disability benefits.  The

Commissioner has moved for judgment on the pleadings.  For the reasons set forth

below, the Commissioner's motion is GRANTED and the decision denying

---

[1]    *See* 42 U.S.C. § 405(g).

benefits is affirmed.

## II.    BACKGROUND

### A.    Procedural History

Morales filed an application for both Social Security and SSI

disability benefits on October 18, 2010, which were denied on January 20, 2011.[2]

The applications alleged that he had been disabled since September 30, 2010, due

to HIV, congenital heart disease, and chronic depression.[3]  Morales requested a

hearing before an Administrative Law Judge ("ALJ"), and ALJ Robert Dorf

presided over a hearing on January 11, 2012.[4]  Morales, who was represented by

counsel, testified at the hearing.[5]  After the hearing, the record was held open for

Morales to submit further documentation, which was added to the record.  On

March 9, 2012, the ALJ issued the decision finding that Morales is not "under a

disability within the meaning of the [Act] from September 30, 2010, through the

date of [the] decision."[6]  The ALJ's decision became the final decision of the

---

[2]    *See* Transcript of the Administrative Record ("Tr."), filed as part of the Commissioner's Answer pursuant to 42 U.S.C. § 405(g), at 49-55, 96-101.

[3]    *See id*. at 96-101.

[4]    *See id*. at 57, 20-39.

[5]    *See id*. at 20-39.

[6]    *Id*. at 16.

Commissioner on May 7, 2013, when the Appeals Council denied Morales's request for review of the ALJ's decision.[7]  On June 18, 2013, Morales commenced this action by filing a complaint.  On February 14, 2014, the Commissioner filed the instant motion.  Morales filed an affirmation in opposition to the motion on May 6, 2014, to which the Commissioner opted not to reply.  The period at issue is from October 18, 2010, the date Morales filed his Social Security and SSI applications, through March 9, 2012, when the ALJ issued his decision.[8]

### B.   Administrative Record

The administrative record consists of non-medical evidence, medical evidence, and hearing testimony.

### 1.   Non-Medical Evidence

Morales is a forty-six-year-old single man who lives alone in an apartment.[9]  He was born on November 21, 1968, and was forty-one years old at the onset of his alleged disability.[10]  Morales is able to cook for himself, keep his apartment clean, and do his own food shopping.[11]  He has good relationships with

---

[7]    *See id*. at 1-4.

[8]    *See* 20 C.F.R. §§ 416.330, 416.335, 416.1481.

[9]    *See* Tr. at 27.

[10]   *See id*.

[11]   *See id*.

friends, relatives, and other persons he comes into contact with.[12]  Prior to his alleged disability, Morales graduated both high school as well as a four-year college with a business degree.[13]  Additionally, Morales has a work history in fashion retail sales.[14]  At the ALJ hearing, Morales gave the following testimony. He was last employed in 2010 at Tang's Department Store as a custom clothing supervisor where he "create[d] garments from scratch with clients."[15]  He left this job after being fired for a "personality conflict."[16]  Prior to this position, he worked at Jayko's Corporation where he sold and designed clothing.[17]  The work was generally performed in a combination of both sitting and standing and did not require lifting more than ten pounds.[18]  Morales was similarly fired from this position for "[t]he same personality conflict" with a supervisor.[19]  Morales's work history also includes a position at Holland and Holland, a retail clothing outlet, that

---

[12]     *See id*. at 33-34.

[13]     *See id*. at 28.

[14]     *See id*.

[15]     *Id*. at 24, 29.

[16]     *Id*. at 29.

[17]     *See id*.

[18]     *See id*. at 30.

[19]     *Id*. at 31.

he left because the store went out of business.[20]  Morales testified he was looking for work at the time of the hearing, sending out resumes and contacting agencies.[21] Morales stated that despite experiencing bouts of depression and at times feeling "listless" and "unmotivated," he is still able to keep appointments and leave the house for interviews.[22]

Morales noted that he has had a ventricular septal defect ("VSD")[23] since birth, but it does not inhibit his ability to walk, perform work, or use public transportation.[24]  Additionally, he is able to lift and carry ten pounds without a problem.[25]  While surgery was recommended for the VSD, it has not been scheduled to date.[26]  Morales also testified that his HIV is under control and he is

---

[20]     See id. at 30-31.

[21]     See id. at 32.

[22]     Id. at 37.

[23]     A ventricular septal defect, a hole in the heart, is a common heart defect that is present at birth (congenital).  It "occurs in the wall that separates the heart's lower chambers (septum) and allows blood to pass from the left to the right side of the heart.  The oxygen-rich blood then gets pumped back to the lungs instead of out to the body, causing the heart to work harder." http://www.mayoclinic.org/diseases-conditions/ventricular-septal-defect/basics/definition/con-20024118.

[24]     See Tr. at 28.  Morales stated that he attended the hearing by subway.

[25]     See id. at 32.

[26]     See id.

asymptomatic.[27]

### 2.    Medical Evidence

#### a.    Treating Physicians

##### i.    Dr. Punyadech Photangtham

Morales has been treated by Dr. Photangtham, a family practitioner who specializes in infectious disease medicine, from 2008 to the time of the hearing.[28]  On January 10, 2008, Morales reported to Dr. Photangtham for an initial exam and consistently visited with Dr. Photangtham for monthly follow-up visits thereafter.[29]  Dr. Photangtham reports that Morales has a past medical history of depression, a heart murmur/congenital VSD, and is HIV positive.[30]

On September 15, 2010, Morales visited Dr. Photangtham for lab results.[31]  Morales denied having any chest pain, shortness of breath, or palpitations.[32]  Morales also denied any leg swelling or new pain.[33]  Morales

---

[27]    *See id*. at 35.

[28]    *See id*. at 252-367.

[29]    *See id*.

[30]    *See id*.

[31]    *See id*. at 252-254.

[32]    *See id*. at 252.

[33]    *See id*.

reported that he was doing well.[34]

On November 17, 2010, Morales returned for a routine visit.[35] Morales was reportedly feeling well with no complaints.[36]  Morales reported that he had recently been laid off from work and would be working nights decorating Ralph Lauren stores for the next two weeks.[37]

On January 26, 2011, Dr. Photangtham evaluated Morales's ability to do work-related activities.[38]  Dr. Photangtham and Joan Bryan, a clinical social worker, opined that Morales's ability to understand, remember, and carry out instructions was not affected by his mental impairment.[39]  They did however note that Morales's "depressed mood and symptoms related to social anxiety can at times interfere with [his] ability to interact appropriately with supervisors, co-workers, and the public as it causes avoidance and anxiety."[40]  They stated further that Morales's depression was being treated with Lexapro and weekly

---

[34]     *See id.*

[35]     *See id.* at 255-257.

[36]     *See id.* at 255.

[37]     *See id.*

[38]     *See id.* at 364.

[39]     *See id.*

[40]     *Id.* at 365.

psychotherapy and that Morales was responsive.[41]

A November 17, 2011 progress report states that Morales's cardiomegaly[42] was stable and that Morales was also stable from a "cardiology standpoint."[43]  Morales reported that he was exercising regularly.[44]  Morales also reported experiencing worsening depression and that he had been working "off the books" on and off in fashion design.[45]

On December 1, 2011, Morales visited with Dr. Photangtham and on examination, Morales had an absolute T4 count of 418 and his blood pressure was 118/70.[46]  Dr. Photangtham opined that Morales was not limited in sitting, standing, lifting, carrying or handling objects.[47]  Dr. Photangtham did note that due to fatigue Morales may be limited in walking but believed Morales could maintain

---

[41]     *See id.*

[42]     Cardiomegaly is a condition wherein the heart becomes enlarged usually as a result of high blood pressure or coronary heart disease. http://www.webmd.com/heart-disease/guide/enlarged-heart-causes-symptoms-types.

[43]     *See* Tr. at 361-363.

[44]     *See id.* at 361.

[45]     *See id.*

[46]     *See id.* at 344-350.

[47]     *See id.* at 346.

lifting and carrying for a duration of up to six hours per day and stand/walk up to eight hours per day.[48]  Dr. Photangtham further opined that Morales did not have any limitations in traveling, understanding, remembering, or responding to work pressures.[49]  He believed Morales would be absent up to one day per month as a result of any physical or mental demands.[50]

### b.   Consulting Physicians

### i.   Beth Israel Medical Center

On April 20, 2010, Morales had a consultation with Dr. Susan Hecht, a cardiologist at The Heart Institute of Beth Israel Medical Center.[51]  She noted that he has had an unrepaired VSD since childhood but was asymptomatic and could walk up sixteen flights of stairs.  Morales complained of occasional palpitations occurring about two times per month but would only last a few seconds.  Dr. Hecht noted that Morales had been HIV positive since 1990.  Additionally, Morales had borderline hypertension but was not taking any medications for the condition.  On examination, Morales appeared well with his blood pressure at 132/88 and a pulse

---

[48]     *See id*. at 346-347.

[49]     *See id*. at 346.

[50]     *See id*. at 349.

[51]     *See id*. at 194.

of 56 regular.  Morales had clear lungs, a "4-5/6 systolic crescendo decrescendo murmur across the precordium, and he had a thrill across his precordium."  Dr. Hecht noted that Morales's examination was "otherwise unremarkable."  On April 22, 2010, Morales underwent an echocardiogram ("ECG") which revealed left ventricular dilation and a significant VSD.  Dr. Hecht recommended that Morales should have the VSD repaired.[52]

### ii.       Columbia University Medical Center

On September 27, 2010, Morales attended a consultation with Dr. Marlou S. Rosenbaum – a cardiologist – for his VSD.[53]  Morales "complained of shortness of breath particularly when running or climbing stairs."[54]  However, "[h]e denied heart racing, leg edema or a history of endocarditis."[55]  Morales also denied experiencing any symptoms of asthma or recurrent chest infections.[56]  On examination, Morales was "well appearing."[57]  An ECG was performed revealing

---

[52]     *See id.*

[53]     *See id.* at 355.

[54]     *Id.*

[55]     *Id.*

[56]     *See id.*

[57]     *Id.* at 357.

-10-

the VSD, left ventricle dilation, and left atrial dilation.[58]  Additionally, it showed a left-to-right shunt across the VSD and moderate right ventricle and right atrial dilation.[59]  A cardiac catheterization was recommended in order to determine shunt size.[60]  Additionally, the report noted possibly closing Morales's VSD.[61]  It was determined that Morales had a "restrictive membranous VSD."[62]  It was also noted that Morales's HIV was "well-controlled on anti-retroviral therapy."[63]  On December 7, 2010, Dr. Rosenbaum recommended right and left cardiac catheterization.[64]

### iii.    Dr. Michael Alexander

On January 10, 2011, psychologist Michael Alexander performed a consultative psychiatric evaluation of Morales.  Morales reported that he stopped working in September 2010 due to a stressful work environment and had been unable to find employment since.  Morales indicated that he was currently seeing

---

[58]    *See id*. at 357, 359.

[59]    *See id*.

[60]    *See id*. at 357.

[61]    *See id*.

[62]    *Id*.

[63]    *Id*.

[64]    *See id.* at 339.

both a psychiatrist and a therapist on a consistent basis. Morales also reported to Dr. Alexander that he was having some difficulty falling asleep and experiencing a loss of appetite. He reported being in a "dysphoric mood" but did not have other symptoms of depression and denied having any suicidal or homicidal thoughts. Morales stated that the depression medication and therapy visits were helpful and improving his "social discomfort."[65]

On examination, Dr. Alexander reported Morales as being a "cooperative, friendly and alert male" who had adequate social skills.[66] Morales was "coherent and goal directed," his speech and thought content were appropriate, he had a neutral mood, his attention, concentration, and memory skills were intact, he had average cognitive functioning, and his insight and judgment were both good.[67] Morales stated he was able to independently cook, clean, dress, groom, manage money, and take public transportation. He also reported having a close relationship with his mother as well as two friends. His daily activities included watching television, listening to music, attending doctor's appointments, and visiting his mother. Dr. Alexander opined that "[t]he results of the examination

---

[65]   *See id.* at 165.

[66]   *Id.* at 166.

[67]   *Id.* at 166-167.

appear to be consistent with psychiatric problems which do not significantly interfere with [Morales's] ability to function on a daily basis."  Dr. Alexander believed Morales would be able to independently follow simple directions, perform simple and complex tasks and learn new ones, make good decisions, maintain a regular schedule, and maintain focus.[68]  Morales was diagnosed with depressive disorder, mild social phobia, heart disease, and HIV positive.[69]  Dr. Alexander stated Morales had a good prognosis and he recommended that Morales continue with his psychiatric treatment.[70]

### iv.   Dr. Benjamin Kropsky

The Division of Disability Determination referred Morales to Dr. Benjamin Kropsky, who performed an internal medicine examination on Morales on January 10, 2011.  Morales complained of having major depression for many years.  Morales also stated that he had been experiencing symptoms of depression, including sleep troubles and not socializing.  He noted he had been HIV positive since 1990 and currently experiencing bronchitis, herpes simplex lesions, and hemorrhoids.  Morales also showed a history of VSD since birth and had recently

---

[68]   *See id*. at 167.

[69]   *See id*. at 167-168.

[70]   *See id*. at 168.

had a cardiac catheterization in December 2010.  Although he was experiencing

some palpitations, shortness of breath, and dizziness, these symptoms did not limit

his ambulation.  He was however told not to "over exert himself."[71]  Morales's

prescribed medications were Bactrim (once a day for ten days), Lexapro 10 mg,

Truvada 300 mg, Viramune 200 mg, and Valtrex 1 g.[72]  Morales reported smoking

ten to fifteen cigarettes per day and drinking two to three beers per week.  His

activities of daily living included watching television, listening to the radio, and

reading.  He stated he was also able to shower and dress himself, cook three times

per week, do laundry, and clean.  Morales noted that he lacked energy and

motivation.

Dr. Kropsky found that Morales had a normal gait and stance, could

do a full squat, was able to walk on his heels and toes, and could rise from a chair

without difficulty.  Dr. Kropsky noted a patch of dry eczema on Morales's neck.[73]

Morales's ears, nose, throat, and teeth were all normal.  His heart had a regular

rhythm but there was a "harsh grade 4/6 to 5/6 holosystolic murmur over the entire

precordium with accentuation in the left lower sternal border and apex."  Morales's

---

[71]   *See id*. at 169.

[72]   *See id*. at 169-170.

[73]   *See id*. at 170.

-14-

cervical spine and lumbar spine both showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  His upper and lower extremities all exhibited full range of motion and the strength was a 5/5.  There was no cyanosis, clubbing, or edema.[74]  His hand and finger dexterity were also intact.[75] Dr. Kropsky diagnosed Morales with HIV and AIDS, depression, and VSD with a fair prognosis for each and further opined that "limitation for activities requiring moderate or greater exertion because of his cardiac condition."[76]

### c.      Reviewing Physicians

### i.      Dr. V. Reddy

On January 19, 2011, psychologist V. Reddy, a state agency examiner, performed a psychiatric review of the record evidence and an assessment of Morales's mental residual functional capacity ("RFC").[77]  Dr. Reddy indicated that Morales had the following functional limitations under paragraph B of the Listings 12.04, 12.06, and 12.09: mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, no difficulties in maintaining

---

[74]      *See id*. at 171.

[75]      *See id*. at 172.

[76]      *Id*.

[77]      *See id*. at 173-190.

concentration, persistence or pace, and no repeated episodes of deterioration.[78]

Based on evidence in the record, Dr. Reddy opined that Morales retained "the

functional capacity for concentration, persistence and pace required in the work

setting."[79]

### C.    The ALJ's Decision and Analysis

The ALJ applied the five-step sequential process to evaluate

Morales's claim.  At step one of his analysis, the ALJ determined that Morales had

not engaged in substantial gainful activity ("SGA") since September 30, 2010.[80]

Next, at step two, the ALJ concluded that claimant's severe impairments were

"HIV positive that is asymptomatic, mild depression, ventricular septal defect and

borderline hypertension."[81]  However, Morales's depressive disorder was not

severe as it "does not cause more than minimal limitation in the claimant's ability

to perform basic mental work activities."[82]  At the third step, the ALJ determined

that Morales "does not have an impairment or combination of impairments that

---

[78]    *See id.* at 183.

[79]    *Id.* at 189.

[80]    *See id.* at 11.

[81]    *Id.*

[82]    *Id.* at 12.

meets or medically equals the severity of one of the listed impairments."[83]   At step

four, the ALJ found that Morales had the RFC to perform light work as defined by

the statute.[84]   The ALJ summarized Morales's testimony at the hearing and the

medical evidence in the record and determined that "a severe depressive disorder

that would affect the performance of work activities [was] not established by the

record."[85]   The ALJ also found that Morales was HIV positive but asymptomatic,

and he was also being treated due to VSD and borderline hypertension, both well

controlled.   Relying heavily on the reports of Dr. Photangtham and Dr. Alexander,

the ALJ found that Morales's depression "[did] not appear to significantly interfere

with [Morales's] ability to function on a daily basis."   The treatment and

consultation notes indicated that "there were no limitations for understanding and

[Morales] could respond appropriately to changes in work settings."   Additionally,

---

[83]      *Id*.

[84]      *See id*.  Light work involves lifting of no more than twenty pounds at
a time with frequent lifting or carrying of objects weighing up to ten pounds. "[A]
job in this category when it requires a good deal of walking or standing, or when
it involves sitting most of the time with some pushing or pulling of arm or leg
controls.  To be considered capable of performing a full or wide range of light
work, you must have the ability to do substantially all of these activities.  If
someone can do light work, we determine that he or she can also do sedentary
work, unless there are additional limiting factors such as loss of fine dexterity or
inability to sit for long periods of time."  20 C.F.R. § 416.967(b).

[85]      Tr. at 15.

Morales "could perform activities within a schedule and maintain regular attendance."  Moreover, Morales had the ability to independently dress, bathe, groom, cook, clean, shop, manage money, and take public transportation.

Furthermore, the ALJ did not find Morales's statements regarding limitations to be credible as Dr. Photangtham's notes indicate that Morales "was not limited for sitting, standing, lifting, carrying, pushing, pulling or handling objects."  The ALJ did note that Morales could not do heavy lifting or carrying as he had "limitations for activities requiring moderate or greater exertion because of his cardiac condition."  The ALJ also based his decision on Morales's statements regarding his work history as Morales testified that he did not stop working because of his medical condition, but rather he was fired for a "personal dispute with the manager/owner."[86]  Thus, the ALJ found that Morales could perform his prior jobs as a custom clothes designer and salesperson because as described in the Dictionary of Occupational Titles, both positions only required light exertional demands.[87]

Finally, the ALJ concluded that Morales "is capable of performing

---

[86]     *See id*.

[87]     *See id*.  *See also* Dictionary of Occupational Titles, DOT 142-061-018-svp7; DOT 261.357-050-svp4.

past relevant work as a customer clothes designer and salesperson."[88]  The ALJ

reasoned that as of November 2011 Morales had been working and was also

looking for new employment and thus the evidence in the record did not support a

finding of a condition that would preclude the performance of his previous

position.[89]  The ALJ compared Morales's RFC with the physical and mental

demands of his prior job and determined that Morales is able to perform the work

as it is generally performed.[90]  Thus, Morales "has not been under a disability . . .

from September 30, 2010," and his claim for benefits was denied.[91]

## III.   LEGAL STANDARD

### A.   Standard of Review

#### 1.   Substantial Evidence Standard

In reviewing an ALJ's decision, a district court does not conduct a de

novo review of the ALJ's decision.[92]  The ALJ must set forth the crucial factors

---

[88]     Tr. at 15.

[89]     *See id*. at 16.

[90]     *See id*.

[91]     *Id*.

[92]     *See Petrie v. Astrue*, 412 Fed. App'x 401, 403 (2d Cir. 2011).  *See also Brickhouse v. Astrue*, 331 Fed. App'x 875, 876 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

supporting his decision with sufficient specificity,[93] but a district court must not disturb the ALJ's decision if "correct legal standards were applied" and "substantial evidence supports the decision."[94]  "Substantial evidence is 'more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[95]

"'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"[96]  Even if there is substantial evidence for the claimant's position, the Commissioner's decision must be affirmed when substantial evidence exists to

---

[93]     *See McCallum v. Commissioner of Soc. Sec.*, 104 F.3d 353 (Table) (2d Cir. 1996); *Ramos v. Barnhart*, No. 02 Civ. 3127, 2003 WL 21032012, at *6 (S.D.N.Y. May 6, 2003).

[94]     *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  *See also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").  *Accord Halloran*, 362 F.3d at 31.

[95]     *Burgess v. Astrue*, 537 F.3d 117, 127-28 (2d Cir. 2008) (quoting *Richardson v. Perales*, 402 U.S.  389, 401 (1971)).  *Accord Halloran*, 362 F.3d at 31; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

[96]     *Tarsia v. Astrue*, 418 Fed. App'x 16, 17 (2d Cir. 2011) (quoting *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999)).

support it.[97]  Moreover, the Commissioner's findings of fact, as well as the

inferences and conclusions drawn from those findings, are conclusive even in cases

where a reviewing court's independent analysis of the evidence might differ from

the Commissioner's analysis.[98]

### 2. Full and Fair Hearing

However, the reviewing court must be satisfied "that 'the claimant had

a full and fair hearing under the Secretary's regulations and in accordance with the

beneficent purposes of the Act.'"[99] In this regard, the ALJ must affirmatively

develop the record in light of the essentially non-adversarial nature of a benefits

proceeding.[100]  "This duty arises from the Commissioner's regulatory

---

[97]  *See Davila-Marrero v. Apfel*, 4 Fed. App'x 45, 46 (2d Cir. 2001) ("'Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.'") (quoting *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)).  *See also Morillo v. Apfel*, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

[98]  *See Hartwell v. Barnhart*, 153 Fed. App'x 42, 43 (2d Cir. 2005).

[99]  *Echevarria v. Secretary of Health and Human Serv.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Secretary of Health, Educ., and Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).  *Accord Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999) (citing *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)) (explaining that the Act must be liberally construed because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits)).

[100]  *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

obligations,"[101] which include developing plaintiff's "complete medical history,"

and making "every reasonable effort" to help the plaintiff get the required medical

reports.[102]  This duty "exists even when . . . the claimant is represented by

counsel."[103]  "Where there are gaps in the administrative record, remand to the

Commissioner for further development of the evidence is appropriate."[104]

    **B.**    **Five-Step Process**

        **1.**    **Physical Impairment**

Pursuant to the Act, the SSA has established a five-step sequential

process to determine whether a claimant is disabled.[105]  At step one, the ALJ must

decide whether the claimant is engaging in SGA.[106]  Generally, if the claimant has

earnings from employment above a certain level, he is presumed to be able to

---

[101]    *Pratts*, 94 F.3d at 37.

[102]    20 C.F.R. § 404.1512(d).

[103]    *Pratts*, 94 F.3d at 37 (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).

[104]    *Jones*, 66 F. Supp. 2d at 524 (citing *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999)).  *Accord Richardson v. Astrue*, No. 09 Civ. 1841, 2009 WL 4793994, at *8 (S.D.N.Y. Dec. 14, 2009) ("If the ALJ's rationale could be rendered more intelligible through further findings or a more complete explanation, remand is appropriate.") (citing *Pratts*, 94 F.3d at 39).

[105]    *See* 20 C.F.R. § 404.1520(a)(4).

[106]    *See id*. § 404.1520(a)(4)(I).

engage in SGA and is deemed not disabled.[107]  If the claimant is not engaging in

SGA, the analysis continues.

At step two, the ALJ must determine whether the claimant has a

"severe" medically determinable impairment or combination of impairments.[108]

An impairment or combination of impairments is severe if it significantly limits the

claimant's ability to perform basic work-related activities.[109]  An impairment is not

severe when the evidence establishes only a slight abnormality or a combination of

slight abnormalities that would have no more than a minimal effect on the

claimant's ability to work.[110]  If the claimant has a severe impairment or

combination thereof, the analysis must proceed.  If no severe impairment is found,

the claimant is deemed not disabled.

At step three, the ALJ determines whether the claimant's impairment

meets or medically equals the criteria of a listed impairment.[111]  If the impairment

---

[107]    *See id.* § 404.1520(b).

[108]    *Id.* § 404.1520(a)(4)(ii).  *See also id.* § 404.1520(c).

[109]    *See id.* §§ 404.1520(c); 404.1521(b) (defining basic work activities).

[110]    *See id.* § 404.1521(a).

[111]    *See id.*  Part 404, subpart P, Appendix 1 (hereinafter the "Listings" or "Listing of Impairments").  The Listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just SGA.  *See id.* § 404.1525(a) (stating that the purpose of the Listings is to describe impairments "severe enough to prevent an individual

is contained in the Listings, the claimant is considered disabled and the ALJ does not proceed to steps four or five.[112]  If the impairment does not meet the Listings, the analysis continues.

At step four, the ALJ determines the claimant's RFC,[113] which is "the most [claimant] can still do despite [his] limitations," with respect to past relevant work.[114]  In making this finding, the ALJ must consider all of the claimant's impairments, including any "related symptoms, such as pain, [which] may cause physical and mental limitations that affect what [claimant] can do in a work setting."[115]  Then, the ALJ must determine whether the claimant has the RFC to perform any relevant work that the claimant has done in the past.[116116]  "In order to determine at step four whether a claimant is able to perform [his] past work, the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work, and compare these

_____

from doing any gainful activity").

[112]     *See id.* § 404.1520(d), (a)(4).

[113]     *See id.* § 404.1520(e), 404.1545.

[114]     *Id.* § 404.1545(a)(1).

[115]     *See id.*

[116]     *See id.* § 404.1520(f).

-24-

demands to the claimant's residual capabilities."[117] "An ALJ may rely on the claimant's statements, which 'are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work.'"[118118] If the claimant is unable to do any past relevant work, the analysis proceeds.[119]

In step five, the last step of the evaluation, the ALJ must determine whether the claimant's RFC, age, education and work experience allow him to perform any other work in the national economy.[120] If so, the claimant is not disabled. But if he is unable to do other work, the claimant is disabled.

In making this determination, the ALJ considers whether a claimant has exertional or non-exertional impairments or a combination of both. "Exertional" limitations affect a claimant's ability "to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)," and "non-exertional" limitations affect the claimant's ability to meet job demands other

---

[117]   *Kerulo v. Apfel*, No. 98 Civ. 7315, 1999 WL 813350, at *8 (S.D.N.Y. Oct. 7, 1999).

[118]   *Glittens v. Astrue*, No. 12 Civ. 3224, 2013 WL 4535213, at *10 (S.D.N.Y. Aug. 26, 2013) (quoting *Schrader v. Astrue*, No. 08 Civ. 119, 2010 WL 5437249, at *8 (N.D.N.Y. Nov. 4, 2010) (citing SSR 82-62).

[119]   *See id*.

[120]   *See id*. § 404.1520(g)(1).

than those relating to strength.[121]  When a claimant only has exertional limitations, the ALJ makes his disability determination by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"), a matrix of exertional capacity levels and vocational characteristics.[122]  However, "[t]he Grids are inapplicable in cases where the claimant exhibits a significant [or non-negligible] non-exertional impairment (i.e., an impairment not related to strength)."[123]

---

[121]    *See id.* § 404.1569a(b), (c)(1) (listing non-exertional impairments: "(i) You have difficulty functioning because you are nervous, anxious, or depressed; (ii) You have difficulty maintaining attention or concentrating; (iii) You have difficulty understanding or remembering detailed instructions; (iv) You have difficulty in seeing or hearing; (v) You have difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching").

[122]    *See* 20 C.F.R. Part 404, Subpart P, Appendix 2.  "Each numbered rule in the appendix resolves the issue of capability to do other work by addressing specific combinations of the factors (i.e., RFC, age, education, and work experience) that determine capability to do work other than that previously performed." *SSR 83-10*, 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).  In this opinion, I cite to several Social Security rulings; such rulings "are entitled to deference except when they are plainly erroneous or inconsistent with the Social Security Act." *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995) (quotation marks omitted).

[123]    *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."  A nonexertional impairment is non-negligible "when it so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.") (quotation marks and alterations omitted).

Although the claimant generally continues to have the burden of proving disability, a limited burden of production shifts to the Commissioner at step five.  To support a finding that the claimant is not disabled at this step, the Commissioner must provide evidence demonstrating that other work exists in significant numbers in the national economy that the claimant can perform, given his RFC, age, education and work experience.[124]

### 2.    "Special Technique" Applied to Mental Impairments

"[T]he Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments."[125]  The regulations require the application of a "special technique" at steps two and three and at each level of the administrative review process.[126]  The ALJ "must first evaluate [claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [claimant has] a medically determinable mental impairment[.]"[127]  If a medically determinable mental impairment is found, the ALJ "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the

---

[124]    *See* 20 C.F.R. §§ 404.1520(g), 404.1560(c).

[125]    *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a).

[126]    *Id*.

[127]    20 C.F.R. § 404.1520a(b)(1).

impairment [or impairments] and document his findings in accordance with paragraph (e) of this section."[128]  The ALJ must then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c),"[129] which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[130]  The first three areas are rated on a five-point scale, none, mild, moderate, marked, and extreme; and the fourth area is rated on a four-point scale, none, one or two, three, and four or more.[131]  At step two, "if the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits."[132]  But if the claimant's mental impairment is deemed severe, the ALJ must determine at step three whether the impairment meets or equals the severity

---

[128]     *Id.*

[129]     *Id.* § 404.1520a(b)(2).

[130]     *Id.* § 404.1520a(c)(3).  "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Kohler*, 546 F.3d at 266 n.5 (quotation marks omitted).

[131]     *See* 20 C.F.R. § 404.1520a(c)(4).

[132]     *Kohler*, 546 F.3d at 266 (quoting 20 C.F.R. § 404.1520a(d)(1)).

of a mental disorder identified in the Listings.[133]  The ALJ's written decision must reflect application of the technique, including "a specific finding as to the degree of limitation in each of the" four functional areas.[134]  Finally, an analysis under the four broad categories is not a substitute for an RFC determination, which requires a more detailed assessment.[135]

### C.   Medical Sources and the "Treating Physician" Rule

"The term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources.'"[136]  Medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.[137]  Medical sources who are *not* acceptable medical sources

---

[133]   *See* 20 C.F.R. § 404.1520a(d)(2).

[134]   *Id*. § 404.1520a(e)(2).  *See id*. § 416.920a(e)(4) ("The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).").

[135]   *See, e.g., Golden v. Colvin*, No. 12 Civ. 665, 2013 WL 5278743, at *3 (N.D.N.Y. Sept. 18, 2013).

[136]   SSR 06-03p, 2006 WL 2329939, at *1 (S.S.A. Aug. 9, 2006) ("SSR Medical Sources") (citing 20 C.F.R. §§ 404, 1512, 416.912).

[137]   *See id*.

include nurse practitioners, physician assistants, as well as other sources.[138]

Only acceptable medical sources can be relied on to establish the existence of a medically determinable impairment or be considered treating sources whose opinions are entitled to controlling weight under the "treating physician" rule.[139] Under the "treating physician" rule, "the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence."[140] When a treating physician's opinion is not given controlling weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive. These factors include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the

---

[138]    *See id.* at *2.

[139]    *See id.* at *2-3.

[140]    *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (citing 20 C.F.R. § 416.927(d)(2)). *Accord* 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). "Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." *Roman v. Astrue*, No. 10 Civ. 3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) (citing *Canales v. Commissioner of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010)).

opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist.[141]  After considering the above factors, the ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion."[142]  Failure to provide "'good reasons for not crediting the opinion of a claimant's treating physician'" is grounds for remand.[143]

While information from medical sources that are not acceptable medical sources cannot establish the existence of an impairment and are not subject to the treating physician rule, the information and opinions they provide are relevant when assessing the severity of an impairment and a claimant's RFC.[144] Indeed,

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have

---

[141]   *See* 20 C.F.R. § 404.1527(d)(2).

[142]   *Newbury v. Astrue*, 321 Fed. App'x 16, 17 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33).  *See also* 20 C.F.R. § 404.1527(d)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion").

[143]   *Newbury*, 321 Fed. App'x at 17 (quoting *Snell*, 177 F.3d at 133). *Accord Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reason' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

[144]   *See* SSR Medical Sources, 2006 WL 2329939, at *2-3.

increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.[145]

In addition, it may be appropriate to give more weight to the opinion of such a medical source where "he has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation" for his opinion.[146]

### D.    Claimant's Credibility

An ALJ is permitted to consider an individual's activity level in making a determination of credibility. The ALJ will consider "all of the medical and non-medical information in determining credibility."[147] Additionally, while "'[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability,'"[148] the ALJ "'is not required

---

[145]    *Id*. at *3.

[146]    *Id*. at *4.

[147]    20 C.F.R. § 404.1529(c)(3)(I). *See also Rosado v. Shalala*, 868 F. Supp. 471, 472-73 (E.D.N.Y. 1994) (holding that an ALJ may rely on a claimant's activities of daily living as substantial evidence in support of his determination).

[148]    *Montaldo v. Astrue*, No. 10 Civ. 6163, 2012 WL 893186, at *17 (S.D.N.Y. Mar. 15, 2012) (quoting *Horan v. Astrue*, 350 Fed. App'x 483, 485 (2d

to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'"[149] In weighing the credibility of the claimant's testimony, his work history is just one of many factors the ALJ may consider.[150]

## IV.   DISCUSSION

Morales has filed only an Affirmation in Opposition to Motion and he does not explicitly contest the legal arguments in the Commissioner's motion. However, the Second Circuit "'has denied that a plaintiff's failure to file a motion for judgment on the pleadings or to respond to the Commissioner's Rule 12(c) motion will result in the dismissal of his complaint'" and even if a motion for judgment on the pleadings is entirely unopposed that is not sufficient standing for granting it.[151]

### A.   The ALJ Applied the Correct Legal Procedures and the ALJ's Decision Is Supported by Substantial Evidence

In denying Morales's application for disability benefits, the ALJ

─────────────────────────

Cir. 2009)).

[149]    *Id*. (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)).

[150]    *See id*. (citing *Schaal*, 134 F.3d at 502).

[151]    *Orr v. Commissioner of Soc. Sec.*, No. 13 Civ. 3967, 2014 WL 4291829, at *4 (S.D.N.Y. Aug. 26, 2014) (quoting *Nauss v. Barnhart*, 155 F. App'x 539, 540 (2d Cir. 2005) (citations omitted)).

clearly applied the statutory five-step process and Morales does not contest this.[152]
The ALJ's decision is also supported by sufficiently complete and uncontradicted
evidence in the record.

        The ALJ's determination that Morales was capable of performing
light work and, therefore, could return to his past relevant work as a custom clothes
designer and salesperson is well supported by the record evidence.  In finding that
Morales's past relevant work did not require the performance of work related
activities precluded by his RFC, the ALJ performed a thorough review of the entire
record, considering the medical evidence as well as Morales's testimony regarding
his subjective symptoms and work history.  The ALJ specifically discussed
Morales's ability to understand and respond appropriately to work settings; to
perform activities within a schedule and maintain regular attendance; to dress,
bathe, groom, cook, clean, shop, manage his money, and take public transportation;
and to sit, stand, lift, carry, push, pull or handle objects without limitation.  The
record showed that Morales had worked his entire life and had only recently
stopped working not because of his medical condition, but because he was fired.
Additionally, at the time of the hearing, Morales was looking for employment.

        The ALJ properly considered the assessment of Morales's treating

---

        [152]     *See* Tr. at 9-16.

physician, Dr. Photangtham, whose opinion was well supported by other medical findings and evidence in the record.  Dr. Photangtham's notes support the position that Morales could sit, stand, lift, carry, handle objects, respond appropriately to work situations and changes in the workplace and had only moderate restrictions to interacting with supervisors, co-workers, and the public.  The ALJ also gave considerable weight to the opinions of the consultative physicians, Dr. Alexander and Dr. Kropsky.   The ALJ discussed Morales's VSD, his borderline hypertension that was controlled without medication, his asymptomatic HIV positive status, and his depressive disorder.  As the ALJ noted, Morales's statements concerning "the intensity, persistence and limiting effects of his symptoms" were not credible.[153] Both treatment and consultative reports show Morales's cardiac condition affected only activities requiring moderate or greater exertion and that his depression did not affect his ability to function on a daily basis.[154]  The ALJ inquired into the specific duties involved in Morales's relevant past work and consulted the Dictionary of Occupational Titles which supported his conclusion.[155]

## VI.   CONCLUSION

---

[153]      *See id.*

[154]      *See id.* at 15.

[155]      *See id.*

For the foregoing reasons, the Commissioner's motion is GRANTED and the decision denying benefits is affirmed.  The Clerk of the Court is directed to close this motion [Docket No. 18], and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             December 24, 2014

## - Appearances -

**For Plaintiff (Pro Se):**

Jose L. Morales
1365 Saint Nicholas Avenue
Apt. 28N
New York, NY 10033

**For Defendant:**

Lauren Myers, Esq.
Social Security Administration, Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
(212) 264-2609

Susan D. Baird
Assistant United States Attorney
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2200